**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **JOHN R. WATTS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **5:08-CV-413 (CAR)** |
| | : | |
| | : | |
| **BIBB COUNTY, GEORGIA, and** | : | |
| **WILLIAM C. RANDALL, Chief** | : | |
| **Magistrate, Magistrate Court of Bibb** | : | |
| **County, in both his personal and official** | : | |
| **capacities,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

### *ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

Currently before the Court is Defendants Bibb County's and Chief Magistrate William C. Randall's, in both his official and individual capacities, Motion for Summary Judgment [Doc. 18]. Plaintiff John R. Watts, a former associate magistrate in Bibb County, filed this case alleging that Judge Randall's failure to reappoint him as an associate magistrate was unlawful employment discrimination based on his gender under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) et. seq. ("Title VII") and in violation of the Equal Protection Clause actionable under 42 U.S.C. § 1983; that it was unlawful age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq. ("ADEA"); that it was unlawful retaliation violation of his First Amendment rights to free speech; and that he was denied equal and overtime pay afforded to him under the Fair Labor

Standards Act, 29 U.S.C. § 201 et. seq.[1]  Plaintiff has responded to Defendants' Motion [Doc. 39], and Defendants filed a Reply [Doc. 41].  Having read and considered the Motion, the record in this case, the applicable law, and the arguments of the parties, the Court finds Defendants' Motion for Summary Judgment [Doc. 18] should be **GRANTED in part** and **DENIED in part**.  For the reasons expressed herein, the Court grants summary judgment in favor of Defendants on all claims except Plaintiff's First Amendment retaliation claim against Judge Randall in his individual capacity, which the Court finds may proceed.

## BACKGROUND

This case arises from Plaintiff's allegations that Defendant Judge William C. Randall, elected Chief Magistrate of Bibb County, Georgia, discriminated against Plaintiff based on age and gender when Judge Randall did not re-appoint Plaintiff to another four-year term as an associate magistrate in the Magistrate Court.  Plaintiff also claims that Judge Randall's decision not to re-appoint him was in retaliation for Plaintiff's actions in reporting to the Macon Police Department possible criminal conduct by two other associate magistrates and a clerk in accepting money for performing marriage ceremonies during regular working hours ("love offerings"[2]).  Plaintiff claims that not reappointing Plaintiff was unlawful retaliation by Judge Randall in violation of  his First Amendment right to free speech as enforced through 42 U.S.C. § 1983.  Finally, Plaintiff asserts that

---

[1] Plaintiff also asserted claims under the Employee Retirement Income Security Act of 1974 (ERISA), Georgia's Whistleblower Act, and Georgia's Fair Employment Practices Act.  In his response to Defendants' Motion for Summary Judgment, however, Plaintiff voluntarily dismissed these claims.

[2] Apparently, the media termed this alleged misconduct "love offerings."  Because all parties use this term, the Court will also use it to refer to the magistrates' and clerk's acceptance of money for performing marriage ceremonies during regular business hours.

during the time he did serve as an associate magistrate, he was required to work overtime hours for which he was not paid resulting in a violation of the FLSA. Plaintiff asserts these claims against Judge Randall in both his official and individual capacities and against Bibb County.

Powers and Jurisdiction of the Magistrate Court

The Magistrate Court of Bibb County, in its present form, was established by authority of the 1983 Georgia Constitution and O.C.G.A. § 15-10-1. Ga. Laws 1983, p. 884, § 2-1. One chief judge presides over the both Magistrate Court and the Civil Court.[3] The chief judge is elected by the voters of Bibb County to a four-year term of office. O.C.G.A. § 15-10-20(c)(1). The chief magistrate has the power to appoint associate magistrates who also serve four-year terms concurrent with the chief magistrate's term. O.C.G.A. § 15-10-20. Although the chief magistrate appoints an associate magistrate for a term of office concurrent with the elected chief's term, only the Judicial Qualifications Commission ("JQC") may discipline, remove, or subject an associate magistrate to involuntary retirement. O.C.G.A. § 15-10-24.

Under Georgia law, magistrates have the power to hear applications for and issue arrest and search warrants; to conduct trials on violations of county ordinances and penal ordinances of state authorities; to issue writs and judgments in dispossessory proceedings; to punish contempts

---

[3] The Civil Court of Bibb County was created by local constitutional amendment. 1955 Ga. Laws (Act No. 174), p. 2552 § 2; Art. III, Div. 1, § 5-251, Code of Bibb County, Ga. The Civil Court has concurrent jurisdiction with superior court except in those matters where state law provides exclusive jurisdiction to superior courts. 1995 Ga. Laws (Act No. 165), p. 4072 § 1, Art. III, Div. 1, § 5-254, Code of Bibb County, Ga. Its jurisdiction in all civil matters is capped at $25,000.00. Id. Civil Court judges have the same powers and authority as magistrates judges, except they must possess a law degree, while associate magistrate are not required to have a law degree. 1955 Ga. Laws (Act No. 174), p. 2552 § 8, Art. III, Div. 2, § 5-285, Code of Bibb County, Ga.

by imposing either a fine not to exceed $200 or a term of imprisonment not to exceed 10 days or both; to grant bail in all cases where the granting of bail is not exclusively committed to some other court; to try and sentence defendants for misdemeanor violations of O.C.G.A. § 16-9-20, relating to criminal issuance of bad checks; and to try and sentence defendants for other misdemeanor violations as defined by O.C.G.A. § 17-13-46. <u>See</u> O.C.G.A. § 15-10-2. Currently, Defendant Judge Randall is the Chief Magistrate of Bibb County, and he has appointed five associate magistrates.

<u>Plaintiff John Watts</u>

Plaintiff began working for the Civil Court of Bibb County in 1980 as a deputy sheriff. In 1983, then-chief magistrate Burl Davis appointed Plaintiff as an associate magistrate. At that time, Plaintiff was the only additional magistrate. In 1985 or 1986, three additional magistrate positions were added to the court. Under Judge Davis, Plaintiff was appointed as "senior magistrate." As "senior magistrate," Plaintiff supervised the warrant office, assigned work among the magistrates, which included making the weekly on-call assignments to the criminal court, and determined in-office rotation.

In 1998, Judge Davis died before completing his term. The governor appointed Defendant Randall as chief magistrate to complete Judge Davis' unexpired term which was to expire in 2002. When Judge Randall took office there were five associate magistrates, one male and three females, who had been appointed for four year terms by Judge Davis. One of those magistrates was Plaintiff, and the other four were Carl Wilson, Dorothy Pertilla, Pamela Rogers, and Jane Reeves. Carl Wilson retired in 1999, shortly after Judge Randall took office, and Pamela Rogers passed away in 2001. Judge Randall appointed one female, Josephine Jones, and

one male, William Shurling, for those vacancies.

In November 2002, the voters of Bibb County duly elected Judge Randall judge of the Civil Court and Chief Magistrate, and he re-appointed all of the associate magistrates, including Plaintiff, for the four-year term beginning on January 1, 2003. Thus, the Magistrate Court was comprised of three female and two male associate magistrates. Plaintiff continued in his position as "senior magistrate," and Plaintiff and Judge Randall had a good working relationship. This changed, however, starting in June of 2003. In June of 2003, after Josephine Jones had resigned,[4] Judge Randall gave William Shurling authority over the magistrates and office staff, in effect taking away the responsibilities that Plaintiff had been given as "senior magistrate." It is undisputed that William Shurling acted on behalf of Judge Randall in personnel matters. The change in Plaintiff's responsibilities did not affect Plaintiff's compensation or benefits. There was no longer an individual magistrate with the title of "senior magistrate."

Shortly after being informed that he was no longer in the position of "senior magistrate," Judge Randall issued Plaintiff a written reprimand concerning Plaintiff's alleged misuse of a county-issued cellular telephone. Upon being reprimanded for his use of the cell phone, Plaintiff wrote an apology letter to Judge Randall and copied William Shurling. The cell phone matter was then concluded.

The relationship between Plaintiff and Shurling also deteriorated. They began to have conflicts over the issuance of warrants and rulings in commitment hearings. Shurling had become critical of Plaintiff's rulings in commitment hearings and the way he issued warrants,

---

[4] Judge Randall appointed Selinda Handsford, another female, to fill the vacancy left by Jones.

and their everyday relationship became, to say the least, strained. Plaintiff states that Shurling became hostile, yelling at Plaintiff, calling him names, using profanity, and even making threats. The relationship deteriorated to the point where Plaintiff was openly tape recording his conversations with Shurling. Moreover, after Shurling took over operations of the office, Plaintiff states that there was animosity and hostility within the office personnel generally.

Sometime prior to September 2003, Plaintiff asked Judge Randall that he, Shurling, and Judge Randall meet to discuss the hostility between Plaintiff and Shurling. Judge Randall agreed that a meeting was necessary and scheduled it for the next day. At the meeting Plaintiff asked that the bad feelings between he and Shurling be set aside and requested that Shurling not call him out in public or use profanity towards him. Judge Randall agreed that Shurling and Plaintiff should get along as colleagues. Shurling offered "to bury the hatchet" and move on. Despite an initial attempt, however, the relationship between Plaintiff and Shurling began deteriorating again, and it never recovered. Plaintiff never discussed his and Shurling's relationship with Judge Randall again.

A few months prior to November 2003, Plaintiff learned that two of the associate magistrates – Pertilla and Handsford – and an office assistant – Janet Gray – were improperly charging the public and accepting payment for performing marriages during business hours. Plaintiff had previously suspected certain associate magistrates were accepting these "love offerings" in May 2001. On May 3, 2001, while Plaintiff still retained the position of "senior magistrate," he distributed a memorandum to office personnel concerning these improper charges. In the memorandum, Plaintiff wrote: "[A]ttached is a copy of Opinion No. 169 by the JQC. It is clear that a judge <u>cannot</u> receive and retain as personal income any tips, consideration,

or gratuity for performing ceremonies during normal working hours." (Pl. Depo., Ex. 7). At that time, Plaintiff also brought his suspicions to Judge Randall, and Judge Randall issued a second memo stating that accepting such gratuities was impermissible.

However, in 2003, Plaintiff received evidence that the practice continued. On one occasion, Plaintiff overheard a man at the Magistrates Office telling Janet Gray that he had not been informed he was required to pay a fee in order to be married by the Magistrate Court. Plaintiff also received a telephone call from a man wanting to schedule a time Plaintiff would be available to perform a marriage. Plaintiff had to assure the man no fee was required to perform the ceremony. Moreover, although marriage ceremonies were to be performed by the magistrates on a rotating basis, Plaintiff was receiving no marriage assignments; the assignments were being assigned to Pertilla and Handsford.

Although it is vehemently contested, Plaintiff states he informed Shurling of his suspicions concerning the "love offerings" at an office meeting approximately one month prior to his reporting the improper conduct to the police. According to Plaintiff, because nothing was done to address the issue during that month, on November 4, 2003, Plaintiff made a formal report with the Macon Police Department concerning the "love offerings," which Plaintiff believed to be criminal conduct. Plaintiff contacted Detective Fletcher of the Macon Police Department and reported that magistrates Pertilla and Handsford, along with office assistant Janet Gray, were accepting gratuities for performing marriage ceremonies during regular office hours at the Magistrate Court. It is undisputed that Plaintiff did not directly inform Judge Randall of his suspicions prior to his report to the police. Plaintiff believed that because

Shurling acted on behalf of Judge Randall, informing Shurling of the conduct was the same as informing Judge Randall.

Shortly after Plaintiff reported the conduct to the police, Judge Randall became aware of the report and held a meeting with Plaintiff and Shurling. Judge Randall felt that Plaintiff acted improperly by going to the Macon Police Department before bringing the matter to him. According to Plaintiff, Judge Randall told Plaintiff that his "head was going to roll" for reporting the matter to the police without coming to him first. At that time, the suspected magistrates and office assistant denied the allegations that they were improperly accepting money for performing marriage ceremonies. Judge Randall again issued a memo stating that the acceptance of such gratuities was impermissible.

On November 10, 2003, six days after Plaintiff made the formal report to the police, Judge Randall wrote a letter to the Judicial Qualifications Committee that he characterizes in the pleadings as a letter simply reporting the improper acceptance of gratuities for performing marriage ceremonies and requesting an "investigation" into the matter. However, the bulk of the letter condemns the suspected magistrates[5] who reported the conduct to the police. In the letter, Randall informs the JQC he "feel[s] that the actions of the two magistrates amount to insubordination" and requests the JQC to investigate the magistrates "and tell [Judge Randall] if [he] has any grounds to dismiss these two Magistrates who went over my head and went to the Macon Police Department."

---

[5] At this time, Judge Randall was under the impression that two magistrates – Plaintiff and another magistrate – were involved in reporting the misconduct to the police.

The police investigation established that, in fact, judges Pertilla and Handsford, and office assistant Janet Gray were charging and accepting payments for performing marriage ceremonies during business hours. As a result, on July 13, 2004, judges Pertilla and Handsford, and office assistant Janet Gray were indicted by the Bibb County District Attorney's Office for certain theft charges. Thereafter, in August 2004, the JQC suspended Pertilla and Handsford with pay until resolution of the pending criminal charges.[6] On December 30, 2004, Handsford resigned her magistrate appointment.[7] Janet Gray pled guilty to 14 counts of theft by taking, but on April 22, 2005, the district attorney's office, for disputed reasons,[8] dismissed the charges against judges Pertilla and Handsford. Pertilla resigned her position as magistrate on April 7, 2006, but she continued to receive pay until January 1, 2007, when her official retirement took effect.

Six days after the district attorney dismissed the criminal charges against judges Pertilla and Handsford, Judge Randall filed a formal complaint with the JQC against Plaintiff requesting that he be removed from office. The JQC took no action against Plaintiff.

On December 28, 2006, Randall notified Plaintiff that he would not be reappointed for the upcoming four-year term beginning in January 2007. Thus far in Randall's service as Chief Magistrate, he had never failed to reappoint any judge other than Plaintiff. Apparently, Judge Randall indicated that he wanted the magistrate court to consist of "all lawyers." Plaintiff was

---

[6] Gray, being an office assistant, was not subject to the JQC disciplinary action.

[7] Randall appointed Cedric Leslie, a male attorney, to fill the open slot.

[8] Plaintiff contends that the charges were dismissed due to the special prosecutor's violations of the speedy trial act.

not a lawyer. However, Judge Randall did reappoint Janet Reeves who also was not a lawyer.

In January 2007, the beginning of Judge Randall's new four-year term, there were two magistrate positions that needed to be filled due to the non-reappointment of Plaintiff and the official retirement of Pertilla. Judge Randall appointed two females to fill those slots, Erica Woodford and Boni Bush.

Plaintiff filed this lawsuit against Judge Randall and Bibb County claiming that his non-reappointment was unlawful. Specifically, Plaintiff claims Randall unlawfully denied him reappointment in retaliation for reporting the "love offerings," a violation of his First Amendment right to free speech. Moreover, Plaintiff asserts that Judge Randall unlawfully discriminated against him based on his age and gender, in violation of the Age Discrimination in Employment Act, Title VII, 42 U.S.C. § 1983, and the Equal Protection Clause, and that while he worked he was denied overtime hours for which he was not paid in violation of the FLSA.

Defendants claim that Randall's decision not to reappoint Plaintiff was based on multiple legitimate, non-discriminatory reasons, including: (1) Plaintiff's misuse of the Magistrate Court cell phone for personal use; (2) Plaintiff's decision to report the improper acceptance of money for performing marriage ceremonies to the police instead of Judge Randall; (3) his insubordination; (4) his propensity to lie; (5) his disloyalty; (6) his vindictiveness; and (7) his deviousness.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th

Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## DISCUSSION

## I.     Adverse Employment Action

Defendants first argue that Plaintiff's Title VII and § 1983 gender discrimination claims, ADEA age discrimination claim, and his First Amendment Retaliation claim must be dismissed because Plaintiff's failure to be reappointed as a magistrate does not constitute an adverse employment action, which is essential to each of those claims. The Court, however, disagrees and finds that a reasonable person could determine that Plaintiff's failure to be reappointed constitutes an adverse employment action.

The Supreme Court has defined an adverse employment action as "a tangible employment action [which] constitutes a significant change in employment status such as hiring, firing, failure to promote, reassignment with significantly different responsibilities causing a significant change in benefits." Burlington Industr. v. Ellerth, 534 U.S. 742, 761 (1998). A plaintiff "must show a *serious and material* change in the terms, conditions, or privileges of employment" to establish an adverse employment action. Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original). Not all conduct by an employer that negatively affects an employee constitutes adverse employment action in a discrimination context. "[T[he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. at 1238. Thus, whether an employment action is adverse is "a question of fact, although one still governed by the traditional rules governing summary judgment." Hyde v. K.B. Home, Inc., 355 Fed. Appx. 266, 268 (11th Cir. 2009) (citing Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 828-29 (11th Cir. 2000)).

The Court finds that a question of material fact exists as to whether Judge Randall's failure to reappoint Plaintiff as a magistrate constitutes an adverse employment action. A reasonable person in Plaintiff's circumstances could find that Plaintiff's non-reappointment was a serious and material change in the terms, conditions, or privileges of his employment and therefore an adverse employment action. Indeed, Defendants have failed to show how Plaintiff's non-reappointment is *not* a serious and material change in the terms, conditions, or privileges of employment. Although Judge Randall has the discretion to decide whom to appoint, that discretion cannot be exercised in violation of the law. That Plaintiff was not promised or entitled to another term of service is a factor the jury can consider in its determination as to whether his non-reappointment constitutes an adverse employment action.

The Court can find no Eleventh Circuit case law directly on point, and the Court is not persuaded by the case law and arguments presented and relied on by Defendants in support of their argument that failure to reappoint cannot constitute an adverse employment action as a matter of law. While the Eleventh Circuit has not specifically addressed this issue, other circuits have found that failure to reappoint is an adverse employment action. See Doucet v. Univ. of Cincinnati, 2007 WL 2445993, *5 (6th Cir. Aug. 28, 2007) (failure to reappoint university professor potentially an adverse employment action); Welch v. Ciampa, 542 F.3d 927, 936 1st Cir. 2008) (plaintiff's non-reappointment to detective sergeant position constitutes adverse employment action sufficient to support § 1983 claim); Rico-Sanz v. State of Louisiana, 2006 WL 3147730, *7 (M.D. La., Oct. 23, 2006) (because defendant did not explain how failure to reappoint plaintiff to his position as postdoctoral fellow had not effected a material change in the terms and conditions of his employment, court assumed plaintiff would be able to show adverse employment action); Dorman

13

v. Webster Central School District, 576 F. Supp. 2d 426, 429 (W.D. N.Y. 2008) (plaintiff sufficiently demonstrated for purposes of proving prima facie case of discrimination that his failure to be reappointed as a coach was an adverse employment action). Thus, this Court cannot determine, as a matter of law, that Judge Randall's decision not to re-appoint Plaintiff did not constitute an adverse employment action.

## II.    Plaintiff Not a Covered Employee under Title VII, ADEA, and FLSA

In order to have a cognizable claim under Title VII, the ADEA, and FLSA, an employer-employee relationship must exist. Here, the dispute concerns whether Plaintiff is a covered "employee" under the statutes. Each of these statutes defines "employee" as "any individual employed by any employer." 42 U.S.C. § 2000e- (Title VII); 29 U.S.C. § 203(e)(1) (FLSA); and 29 U.S.C. § 630(f) (ADEA). However, each statute exempts four categories of workers: (1) elected officers; (2) the individuals chosen by such an officer to be members of his or her "personal staff"; (3) such officer's appointees "on a policy-making level"; and (4) an immediate advisor with respect to the exercise of the "constitutional or legal powers of the office." 42 U.S.C. § 2000e(f) (Title VII); 29 U.S.C. § 630(f) (ADEA); 29 U.S.C. § 203(e)(2)(C)(I-III) (FLSA). [9] Here, the issue centers on whether Plaintiff, as an appointed associate magistrate, is

---

[9] As the Court of Appeals for the Seventh Circuit has observed, the exemptions are also found in the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(I); the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 402(f); the Employee Retirement Income Security Act, 29 U.S.C. § 1002(6); the Family and Medical Leave Act 29 U.S.C. § 2611(3) (incorporating § 203(e); and the Americans with Disabilities Act, 42 U.S.C. § 12111(4). E.E.O.C. v. Sidley Austin Brown & Wood, 315 F.3d 696, 708 (7th Cir. 2002).

exempt from coverage under Title VII, the ADEA, and FLSA[10] as an appointee of an elected official who is "on the policy making level."

This policymaking-appointee exception should be construed narrowly. <u>EEOC v. Reno</u>, 758 F.2d 581, 584 (11th Cir. 1985). The determination of whether an individual should be considered an "employee" under Title VII is governed by federal law, but the Court may look to state law to determine a person's duties, and how he is hired and fired. <u>Reno</u>, 758 F.2d at 584. Although the exemptions are highly fact dependant, summary judgment may be appropriate when there is no genuine issue of material fact as to the applicability of the relevant factors. Because the Court finds there is no genuine issue of material fact as to the applicability of the relevant factors, the Court is able to make this determination on a motion for summary judgment. The Court finds Plaintiff meets the criteria for an "appointee on a policy-making level" and therefore may not proceed with his Title VII, ADEA, and FLSA claims.

Here, it is undisputed that Judge Randall is an elected official. In addition, under Georgia law, the chief magistrate has the power to appoint an associate magistrate. O.C.G.A. § 15-10-20(d) ("Magistrates other than the chief magistrate shall be appointed by the chief magistrate with the consent of the judges of superior court. The term of a magistrate so appointed shall run concurrently with the term of the chief magistrate by whom he was appointed."). It is further undisputed that after his election, Judge Randall appointed Plaintiff to

---

[10] Defendants did not argue that Plaintiff was exempt under the FLSA; however, the exemption plainly applies to FLSA claims as well.

his position as an associate magistrate.[11]  Thus, the key issue in this case is whether Plaintiff was an appointee on a policymaking level while he served as an associate magistrate.

Title VII does not define "appointee on a policymaking level."  However, the Court finds the Supreme Court's decision in <u>Gregory v. Ashcroft</u>, 501 U.S. 452 (1991), to be controlling.  In <u>Gregory</u>, the Supreme Court found that appointed state judges were exempt from the protections of the ADEA as "appointees on the policymaking level."  The Court pointed out that the statute refers to appointees "on the policymaking level," not to appointees "who make policy."  The Court explained that it may be sufficient that the appointee is in a position requiring the exercise of discretion concerning issues of public importance, and this certainly describes the bench, regardless of whether judges might be considered policymakers in the same sense as the executive or legislature.  The Court concluded the appointed state court judges fell presumptively under the policymaking-level exemption to the ADEA, stating that it would not read the ADEA to cover state judges unless Congress had made it clear that judges are included; because Congress had not made it clear that the statute covered appointed state judges, the judges were not covered.

Plaintiff's arguments concerning the factual differences between <u>Gregory</u> and the case currently at bar, such as that the judges in <u>Gregory</u> were appointed by the State's Governor, are distinctions without a difference.  For the reasons set forth in <u>Gregory</u>, the Court finds that Plaintiff as an appointed magistrate, falls under the appointed-policymaker exemption and

---

[11] Although the judges of the superior court must consent to the appointee, the requirement that an appointee be personally appointed by an elected official is satisfied.  The requirement that superior court judges approve the chief magistrate's selection merely results in more than one elected official making the appointment.

therefore is not entitled to coverage under Title VII, the ADEA, and the FLSA.

Even if the Court were to find the distinctions between Gregory and the facts of this case persuasive, the Court finds Plaintiff would still fall under the exemption. Neither party has identified any case law, and the Court is aware of no Eleventh Circuit case law directly addressing whether a magistrate falls under the policymaking-appointee exemption. However, several other circuits have delineated certain factors relevant to the analysis. Those factors include: (1) "whether the [appointee] ha[d] discretionary rather than solely administrate powers"; (2) "whether the [appointee] serve[d] at the pleasure of the appointing authority"; and (3) whether the [appointee] formulate[d] policy." Stillians v. Iowa, 843 F.2d 276, 278 (8th Cir. 1988), abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991) (citations omitted). In analyzing these factors, the Court looks to what is required of the position itself, not necessarily the specific duties undertaken by the individual. See Blevins v. City of Tuskegee, Ala., 2010 WL 2541147, *5 (M.D. Ala., June 18, 2010) (citing Heck v. City of Freeport, 985 F.2d 305, 309 (7th Cir. 1993) ("[C]ourts have made clear that the proper inquiry relates not to the powers exercised by the plaintiff, but to the powers inherent in the position occupied by the plaintiff."); Butler v. New York State Dept. of Law, 998 F. Supp. 336, 345 (S.D. N.Y. 1998) ("High level personnel who appear for and help fulfill the duties of the elected official, and who, by virtue of their job titles could potentially be required to work closely with the elected official, regardless of whether they actually did or not, should fall within [the policymaking] exemption.").

Plaintiff clearly had discretionary powers as an associate magistrate. Under Georgia law, associate magistrates have the power to hear applications for and issue arrest and search

17

warrants; to conduct trials of violations of county ordinances and penal ordinances of state authorities; to issue writs and judgments in dispossessory proceedings; to punish contempts by either imposing a fine not to exceed $200 or by imprisonment not exceeding 10 days or both; to grant bail in all cases where the granting of bail is not exclusively committed to some other court; to try and sentence defendants for misdemeanor violations of O.C.G.A. § 16-9-20, relating to criminal issuance of bad checks; and to try and sentence defendants for other misdemeanor violations as defined by O.C.G.A. § 17-13-46. See O.C.G.A. § 15-10-2. Clearly, magistrate judges must exercise their discretion in each of these functions, as they have the power to interpret and apply the law according to his or her own individual judgment. Thus, the first factor weighs in favor of applying the exemption.

The second factor, whether the appointee served at the pleasure of the appointing authority, must be analyzed slightly differently in the context of judges, including magistrates. There is no dispute that Judge Randall appointed Plaintiff as an associate magistrate, and there is no dispute that after the four year term, a chief magistrate has the discretion to re-appoint the magistrate or not. Once appointed, however, only the JQC may discipline or remove a magistrate during the four year term. This fact does not preclude application of the policymaker exemption. Indeed,

> each judge, once appointed, and *no matter how lowly*, is expected to act independently from his appointer. This difference does not act to preclude application of the "policymaker" exemption to the judiciary, it simply calls for a slightly different understanding of who is a policymaker for purposes of the exemption. It is also worth noting that Congress did not strictly limit the exemption to policymakers, but rather applied it to those "at a policymaking level." This appears to be a somewhat more flexible standard, which requires us to look at the position of the appointees within government structure, and not so much the particular duties of the persons involved.

Equal Employment Opportunity Comm'n. v. Commonwealth of Mass., 858 F.2d 52, 56 (1st Cir. 1988) (emphasis added). Thus, this factor does not play a role in this case.

The third factor the Court must consider is whether Plaintiff formulated policy. "Clearly, each judge, as a separate and independent judicial officer, is at the very top of his particular 'policymaking' chain of command, responding, if we can call it that, only to a higher appellant court." Equal Employment Opportunity Comm'n, 858 F.2d at 56. In resolving disputes, recommending dispositions, and exercising his or her discretion in the judicial functions he or she is authorized to perform under Georgia law, an associate magistrate formulates policy. See Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 159 (6th Cir. 2004) (magistrate exempt from Title VII coverage as appointee on policymaking level). Because appointed magistrates fall within the policymaking-appointee exemption, Defendants are entitled to summary judgment on Plaintiff's Title VII, ADEA, and FLSA claims.

**III.      § 1983 Gender Discrimination Claim**

Plaintiff also alleges claims under § 1983 that the alleged gender discrimination he suffered violated his right to equal protection under the Fourteenth Amendment. He asserts these constitutional claims against Judge Randall in both his official and individual capacities and against the county. As discussed below, the Court finds that the county is entitled to summary judgment because it has no control over the magistrate's office, and therefore Plaintiff cannot prove that an "official policy" caused a constitutional violation. See Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). Additionally, the Court finds Judge Randall in his official capacity is entitled to summary judgment because he is immune as an arm of the state under the Eleventh Amendment. Finally, Judge Randall is entitled to summary judgment in his individual capacity because

Plaintiff fails to establish Judge Randall's proffered legitimate, non-discriminatory reasons for failing to re-appoint Plaintiff were merely pretext for gender discrimination.

A.    Bibb County

A county is "liable under section 1983 only for acts for which the county is actually responsible." Grech, 335 F.3d at 1329 (citing Canton v. Harris, 489 U.S. 378, 385 (1989) and Monell, 436 U.S. at 694). Plaintiff may establish a constitutional deprivation against the county under § 1983 by either identifying "(1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Id.

Because the county does not have an officially adopted policy regarding the chief magistrate's employment decisions, Plaintiff must show that the county "has a custom or practice of permitting [a constitutional violation] and that the county's custom or practice is the moving force [behind] the constitutional violation." Id. at 1330 (second alteration in original) (internal quotation marks omitted). Under this theory, Plaintiff "(1) must show that [the county] has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for [the county] concerning the act alleged to have caused the particular constitutional violation is issue." Id. (citations omitted). Here, the county's § 1983 liability hinges on whether, under Georgia law, the county wields control over the chief magistrate in his employment-making functions. Id. at 1331-32.

It is clear that the county lacks control over the chief magistrate in his employment-making functions. Under Georgia law, the magistrate court is a constitutionally created office acting as an arm of the state's judicial branch. See Ga. Const. Art. VI, § 1, para. 1 ("The judicial power of the state shall be vested exclusively in the following classes of courts: magistrate

courts, probate courts, juvenile courts, state courts, superior courts, Court of Appeals, and Supreme Court."); and Ga. Const. Art. VI, § 3, para. 1 ("magistrate, juvenile, and state courts shall have uniform jurisdiction as provided by law."). The magistrate's office is not a division or subunit of the county, and the county has no authority or control over the a chief magistrate's employment powers and duties. As set forth by the Georgia Constitution, magistrates are subject to discipline, removal, and involuntary retirement only by the Judicial Qualification Commission. Ga. Const. Art. VI, § 7, para. 6 ("The power to discipline, remove, and cause involuntary retirement of judges shall be vested in the Judicial Qualifications Commission."); see also Ga. Const. Art. VI, § 1, para. 3 (defining "judge" as including magistrates). Only the state legislature has the power to provide for the number of magistrates serving in a county and the method for filling vacancies. O.C.G.A. § 15-10-20(e). It is the chief magistrate, with consent of the superior court judges, that adopts rules for the court. O.C.G.A. § 15-10-6. Georgia law, not the county, sets the minimum salary for magistrates and magistrates are trained by requirements set by the Georgia Magistrate Courts Training Council. O.C.G.A. § 15-10-23. Moreover, with consent of the superior court judges, the chief magistrate alone has the authority to appoint associate magistrates. O.C.G.A. § 15-10-20. Thus, the Court finds that Plaintiff has failed to produce any evidence from which a reasonable factfinder could conclude that the county exercises sufficient control over the chief magistrate's employment decisions to have § 1983 liability for the non-reappointment of Plaintiff as an associate magistrate. Accordingly, the county is entitled to summary judgment as to Plaintiff's § 1983 claims.

B.    Judge Randall in his Official Capacity

The Court finds Judge Randall, in his official capacity, acts as an arm of the State when appointing associate magistrate judges and is therefore entitled to Eleventh Amendment

immunity. The Eleventh Amendment to the United States Constitution "bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued." <u>Manders v. Lee</u>, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1107 (2004). "To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State." <u>Id.</u> "Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." <u>Id.</u> The particular functions at issue in this case are a chief magistrate's decisions to appoint an associate magistrate judge.

Whether Judge Randall in his official capacity is an arm of the state protected by the Eleventh Amendment turns on his function and character as determined by state law. <u>Fouche v. Jekyll Island State Park Auth.</u>, 713 F.2d 1518, 1520 (11th Cir. 1983). Factors that bear on this determination are "(1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." <u>Manders</u>, 338 F.3d at 1309.

In assessing these factors, the Court finds the chief magistrate should be considered an arm of the state and therefore entitled to immunity under the Eleventh Amendment. As stated above, the responsibility of appointing associate magistrates, the particular function at issue here, is a function delegated to chief magistrates by the State. O.C.G.A. § 15-10-20(c)(1). Moreover, the Georgia Constitution created the magistrate's office as a part of Georgia's judicial branch. Ga. Const. Art. VI, § 1, para. 1. The magistrate court is assigned the task of applying the law of the state, not the county. Magistrates are subject to discipline, removal, and involuntary retirement only by the JQC in accordance with the Georgia Constitution, not the county

governing authority.  See O.C.G.A. § 15-10-24.   Thus, Judge Randall in his official capacity is

an arm of the state and is entitled to summary judgment on Plaintiff's § 1983 gender

discrimination claim.

C.      Judge Randall in his Individual Capacity

        1.      *Judicial Immunity*

Judge Randall first argues that he is entitled to summary judgment on Plaintiff's § 1983

claims brought against him in his individual capacity, because he is entitled to judicial immunity.

Judicial immunity is applicable to suits under § 1983,  Pierson v. Ray, 386 U.S. 547, 548, 554-55

(1967), and applicable to judges at all levels.  "A judge of whatever status in the judicial

hierarchy, is immune from suit for damages resulting from any act performed in the judicial

role."  Ammons v. Baldwin, 705 F.2d 1445, 1447 (5th Cir. 1983), cert. denied, 465 U.S. 1006

(1984).   "In determining whether a particular act performed by a judge is entitled to absolute

immunity, a court must draw a distinction between judicial acts and the administrative,

legislative, or executive functions that judges may on occasion be assigned by law to perform."

Davis v. Tarrant County, Texas, 565 F.3d 214, 221 (5th Cir. 2009) (internal quotation marks and

citation omitted).

The Court finds Judge Randall is not entitled to judicial immunity because the

appointment of associate magistrates is an administrative, not a judicial, function.  The decision

to appoint magistrates does not involve judicial discretion.  The chief magistrate judge does not

utilize his education, training, or experience in the law to decide whether or not to appoint or re-

appoint an associate magistrate.  While the chief magistrate is charged under Georgia law with

appointing associate magistrates, and such appointments are essential to the efficiency of the

magistrate court, this is an administrative function, not an act taken in the judge's judicial

capacity. "Although administrative decisions may be essential to the very functioning of the courts, such decisions have not been regarded as judicial acts." <u>Id.</u> at 222 (collecting cases); <u>see, e.g.</u>, <u>Forrester v. White</u>, 484 U.S. 219, 229 (1988) (judge's demotion and discharge of court employee were administrative acts not protected by judicial immunity); and <u>In Ex parte Virginia</u>, 100 U.S. 339, 348 (1880) (judge's preparation of an annual list of individuals eligible to serve on grand juries not a judicial act covered by judicial immunity). The act of reappointing an associate magistrate is an administrative personnel decision and therefore not protected by judicial immunity. Thus, Judge Randall is not entitled to judicial immunity, and the Court must address Plaintiff's § 1983 gender discrimination claim on the merits.

2.      *Merits of Discrimination Claim*

To establish his gender discrimination claim, Plaintiff must present proof of discriminatory intent through either direct or circumstantial evidence. <u>Cross v. State of Ala. Dept. of Mental Health and Mental Retardation</u>, 49 F.3d 1490, 1507-08 (11th Cir. 1995).

a.      <u>Direct Evidence of Discrimination</u>

Direct evidence of discrimination is that which shows an employer's discriminatory intent "without any inference or presumption." <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). The Eleventh Circuit has defined direct evidence of discrimination "as evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." <u>Van Voorhis v. Hillsborough County Bd. of County Com'rs</u>, 512 F.3d 1296, 1300 (11th Cir. 2008) (internal quotation marks and citations omitted). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [gender] constitute direct evidence of discrimination." <u>Id.</u> (citations omitted). "If the

alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (citation omitted). As direct evidence of discrimination, Plaintiff points to the testimony by Rhonda Roell-Taylor[12] and Boni Bush who both testified they had the impression that Judge Randall wished to hire a woman to fill Plaintiff's position. Plaintiff also points to the fact that Shurling could not specifically recall whether he told Roell-Taylor that Judge Randall wished to hire a woman.

These testimony, however, do not constitute direct evidence of gender discrimination. In fact, the statements by Roell-Taylor and Boni Bush are merely hearsay and therefore inadmissible. Shurling's statement, at most, only suggests a discriminatory motive. The statements cannot serve as direct evidence of discrimination because there is no evidence that Judge Randall actually said he was not going to reappoint Plaintiff because he wanted to hire a woman. No clear evidence exists of Judge Randall's alleged discriminatory intent without inference or presumption. Thus, Court must evaluate his case under the "circumstantial evidence" framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

b.     Circumstantial Evidence of Discrimination

Because the elements of a gender discrimination claim are the same under both Title VII and § 1983, the McDonnell Douglas burden shifting framework applies. See, e.g., Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843 n. 11 (11th Cir. 2000); McDonnell Douglas v.

---

[12] Roell-Taylor was initially appointed to fill one of the two openings due to Plaintiff's non-appointment and Pertilla's official retirement. She ultimately did not accept the position due to salary concerns. Boni Bush eventually filled the opening.

Green, 411 U.S. 792 (1973).  Plaintiff bears the burden of showing sufficient evidence to allow a reasonable jury to determine that he satisfied the elements of his prima facie case of gender discrimination.  See id.  Once he has done so, the burden shifts to Judge Randall "to articulate some legitimate, nondiscriminatory reason" for failing to appoint Plaintiff.  Id.  At that point, Plaintiff must "be afforded a fair opportunity to show" that Judge Randall's reasons were pretextual.  Id. at 804.

To establish a prima facie case of reverse gender discrimination, such as the one at issue here, Plaintiff must present evidence that would show that "(1) he was qualified and applied for the position; (2) he was rejected despite his qualification; and (3) other equally or less qualified employees who are not members of his [gender] were hired."  Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1104 (11th Cir. 2001).  As both parties recognize, when the plaintiff is a member in a historically favored group, such as males, some courts use a "background circumstances" test to determine whether the defendant is "that unusual employer who discriminated against the majority."  Breiding v. Garrett, 816 F. Supp. 708, 711 (M.D. Fla. 1993); see also Parker v. Baltimore & O.R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981); Mills v. Health Care Serv. Corp., 171 F.3d 450, 457 (7th Cir. 1999); Duffy v. Wolle, 123 F.3d 1026, 1036 (8th Cir. 1997); Reynolds v. School Dist. No. 1, 69 F.3d 1523, 1534 (10th Cir. 1995); Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 66 (6th Cir. 1985).

Here, the Court will assume Plaintiff can prove a prima facie case of reverse discrimination.  Having served as an associate magistrate since 1983, Plaintiff was certainly qualified for the position.  Despite these qualification, Judge Randall failed to reappoint him which the Court has found may constitute an adverse employment action.  Finally, the position

was subsequently filled by a female, as Judge Randall appointed Erica Woodford and Boni Bush to fill the open positions left by Plaintiff and Dorothy Pertilla.

However, Defendant Randall presents legitimate, nondiscriminatory reasons for his decision to not reappoint Plaintiff. An employer's burden of rebuttal is "extremely light." Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1495 (11th Cir. 1995). Judge Randall testified that he did not reappoint Plaintiff because of Plaintiff's (1) misuse of a magistrate court cellular telephone for his personal use; (2) report of improper behavior on the part of other magistrates to an outside source; (3) insubordination; (4) propensity to lie; (5) disloyalty; (6) vindictiveness; and (7) deviousness. The Court finds Defendant Randall has satisfied his light burden of production, and the burden now shifts to Plaintiff to demonstrate that these reasons were merely pretext for gender discrimination

To survive summary judgment, therefore, Plaintiff must provide evidence that creates a genuine issue of material fact that Judge Randall's articulated, nondiscriminatory reasons are, instead, pretext for unlawful gender discrimination. See Brooks v. County Comm'n of Jefferson County, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks and citation omitted) (plaintiff shows pretext by "demonstrat[ing] that the proffered reason was not the true reason for the employment decision[,]" and by "introduc[ing] significantly probative evidence. . . that the asserted reason is merely pretext for discrimination."). An employer's reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Id. at 1163 (emphasis in original) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

The Court "must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citations omitted). To avoid summary judgment, Plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that "each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000). "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id. at 1030.

In view of all the evidence in this case, the Court finds Plaintiff has failed to establish a genuine issue of material fact as to whether Judge Randall's proffered nondiscriminatory reasons were merely pretext for gender discrimination. The evidence does not establish that each of Judge Randall's stated reasons for not reappointing Plaintiff are false or contain implausibilities, inconsistencies, incoherencies, or contradictions that a reasonable factfinder would find unworthy of credence. On the contrary, there is ample evidence, as discussed below, establishing that Judge Randall did not reappoint Plaintiff because he reported the "love offerings" to the police – a stated reason for the non-reappointment. The fact Plaintiff's position was filled by a woman and the testimonies of Roell-Taylor and Boni Bush stating they had the impression Judge Randall wished to hire a female, are clearly insufficient to rebut Judge Randall's proffered nondiscriminatory reasons for Plaintiff's nonreappointment. In evaluating the employer's proffered non-discriminatory reasons, courts must be careful not to substitute their judgment for the business judgment of the employer. "Federal courts do not sit as a super-

28

personnel department that reexamines an entity's business decisions." <u>Chapman</u>, 229 F.3d at 1030. Thus, the Court finds Plaintiff fails to create a genuine issue of material fact as to whether Judge Randall's proffered nondiscriminatory reasons for not reappointing him are merely pretext for gender discrimination, and Defendant Randall, in his individual capacity, is entitled to summary judgment on this claim.

## IV.     First Amendment Retaliation Claim

Plaintiff also claims that Judge Randall's failure to reappoint him was unlawful retaliation for reporting the improper conduct of the magistrates in charging fees to perform marriage ceremonies to the Macon police department, in violation of his First Amendment rights, actionable through 42 U.S.C. § 1983. Like his § 1983 gender discrimination claims discussed <u>supra</u>, Plaintiff asserts this First Amendment retaliation claim against the county and against Judge Randall in both his individual and official capacities. For the same reasons expressed above, the county is entitled to summary judgment because it has no control over the magistrate's office, and therefore Plaintiff cannot prove that an "official policy" caused a constitutional violation. <u>See</u> <u>Grech v. Clayton County</u>, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978)). Additionally, Judge Randall in his official capacity is entitled to summary judgment because he is immune as an arm of the state under the Eleventh Amendment. Because the Court does not find Judge Randall in his individual capacity is entitled to summary judgment based on judicial immunity, the Court must address the merits of Plaintiff's First Amendment retaliation claim. As discussed below, the Court finds Plaintiff's report of the misconduct was constitutionally-protected speech, and a genuine issue of material fact exists as to whether the non-reappointment was unlawful retaliation.

"The law is well established that the State may not demote or discharge a public employee in retaliation for speech protected under the First Amendment." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989). However, "'[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.'" Abdur-Rahman v. Walker, 567 F.3d 1278, 1281 (11th Cir. 2009) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). Acting as an employer, the government is afforded broad discretion in its employment decisions. Boyce v. Andrew, 510 F.3d 1333, 1341 (11th Cir. 2007) (citation omitted).

For a government employee to establish a First Amendment retaliation claim, the employee must show "(1) that the speech can be fairly characterized as relating to a matter of public concern, (2) that plaintiff's interests as a citizen outweigh the interests of the state as an employer, and (3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action." Akins v. Fulton County, 420 F.3d 1293, 1303 (11th Cir. 2005). If the employee establishes these first three elements, the burden shifts to the employer to show that "it would have reached the same decision . . . even in the absence of the protected [speech]." Anderson v. Burke County, Ga., 239 F.3d 1216, 1219 (11th Cir. 2001) (internal quotation marks and citation omitted). The first two elements are questions of law, and the last two parts are questions of fact. Id..

Citizen Speaking as Matter of Public Concern

The Court must first determine "(1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." Boyce, 510 F.3d at 1342 (citing D'Angelo v. School Bd. of Polk County, Fla., 497 F.3d 1203, 1209 (11th Cir. 2007)). To qualify as constitutionally

protected speech in the First Amendment, "the speech must be made by a *government employee speaking as a citizen and be on the subject of public concern*." Id. (emphasis in original) (citations omitted). If the government employee was speaking as an employee, there can be no First Amendment protection, and the constitutional inquiry ends. Id.

In order to determine whether the government employee spoke as a citizen and addressed matters of "public concern," the Court must determine "whether the speech at issue was made primarily in the employee's role as a citizen, or primarily in the role of employee. Boyce, 510 F.3d at 1341 (citation omitted). Whether a government employee's speech "relates to his or her job as opposed to an issue of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Boyce, 510 F.3d at 1343 (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). "Public concern" is defined as speech that relates "to a matter of political, social, or other concern to the community." Akins, 420 F.3d at 1304 (internal quotation marks and citation omitted). Because an employee's speech "will rarely be entirely private or entirely public," it is protected so long as the "main thrust" of the speech is on a matter of public concern. Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993).

Defendants in this case concede that Plaintiff meets this first prong of the test. The Court agrees. The record shows that Plaintiff reported the alleged misconduct primarily as a citizen concerned about the public being fraudulently charged for marriage ceremonies. Plaintiff had no professional obligation to report what he felt to be a criminal act and judicial misconduct, and he was not engaged in a daily professional activity when he made the complaint. The speech at issue here does not owe its existence to Plaintiff's professional obligations; instead, concern over whether the public was being fraudulently charged appears to be the basis of the speech.

Balancing the Interests of the Citizen and State

31

In deciding whether Plaintiff's speech is entitled to First Amendment protection, the Court must next determine whether Plaintiff's interests as a citizen commenting on a matter of public concern outweigh the interests of the State in promoting the efficient operation of the Magistrate Court. This is what is known as the Pickering balancing test. Pickering v. Board of Education, 391 U.S. 563 (1968). In balancing the State's interest in efficient provision of public services against the employee's speech interest, the Court considers several factors, including: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently; (2) the manner, time, and place of the speech; and (3) the context within which the speech was made. Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988), cert. den., 489 U.S. 1013 (1989).

When protected speech occurs in a time, place, and manner that disrupts workplace operations to an extent disproportionate to the First Amendment interests served, the balancing test weighs against the employee. Connick, 461 U.S. at 151-54. A public employer need not accommodate the free-speech interests of its employee if doing so entails a complete breakdown in workplace morale, substantially inhibits the effective delivery of public services, or unreasonably disrupts other important aspects of normal business operations. See Tindal v. Montgomery County Com'n, 32 F.3d 1535, 1540 (11th Cir. 1994) (government employers may take action against employees who engage in speech that "may unreasonably disrupt the efficient conduct of government operations.").

Here, the Court concludes that under the circumstances presented, Plaintiff's interests as citizen outweigh Judge Randall's interests as employer. Defendant argues that Plaintiff's behavior in "secretly" initiating a criminal investigation into magistrates improperly accepting gratuities for performing marriage ceremonies (1) caused "immense disruption" to the

Magistrate's Office; (2) upset the office structure "when rumors began to circulate that the district attorney was investigating magistrates and magistrate office employees; (3) caused a "major distraction to all employees" when the local media began to follow the prosecution; and (4) impeded the effectiveness of the office.

First, there is evidence in the record establishing that there was disruption, hostility, and animosity between office personnel months before Plaintiff reported the "love offerings." Moreover, although the report of the "love offerings" certainly caused further disruption in the office, the record contains no evidence that because of the report the Magistrate Court could not operate its *official* duties efficiently. Finally, there is no evidence that Plaintiff's performance of his duties as a magistrate was impeded or that the effect of the report interfered with the legal duties of the office.

While harmony between office personnel in the office may have been disrupted, the magistrate's office is not a paramilitary or quasi-military organization, like a police department, which the Eleventh Circuit has recognized have more specialized inter-personnel concerns than a normal government office. See, e.g., Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994); Kelley v. Johnson, 425 U.S. 238, 246 (1976) (remarking that there is a "need for discipline, esprit de corps, and uniformity" in police departments). The essential operation of the Magistrate's Office does not depend on the close working relationships of its personnel. See Connick, 461 U.S. at 151-52 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."). Thus, the Court cannot conclude that the interests of Judge Randall in maintaining the efficient operation of the magistrate's office outweigh Plaintiff's First Amendment right to speak out on alleged fraudulent activity affecting the public. Thus, the Court finds Plaintiff engaged in

constitutionally-protected speech.

<u>Substantial Factor in Termination</u>

Having found Plaintiff's speech was constitutionally protected, the Court must examine whether the speech played a substantial or motivating role in the government's decision to take an adverse employment action. This third factor is a question of fact "designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision." <u>Beckwith v. City of Daytona Beach Shores</u>, 58 F.3d 1554, 1564 (11th Cir. 1995). Once it is established that the plaintiff engaged in protected speech, the Court must then determine whether that protected speech was a substantial motivating factor in the employment decision. <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1288 (11th Cir. 2000). The Plaintiff must establish a causal connection between the protected speech and the adverse employment action. "[T]he plaintiff's burden in this regard is not a heavy one." <u>Id.</u> at 1291.

The Court finds there is a genuine issue of material fact as to whether Plaintiff's protected speech in reporting the alleged misconduct was a substantial factor in Judge Randall's decision to not re-appoint Plaintiff to another term as an associate magistrate judge. Indeed, one of Judge Randall's stated reasons for not reappointing Plaintiff was for reporting "improper behavior on the part of other magistrates to an outside source." The other reasons were Plaintiff's (1) misuse of a magistrate court cellular telephone for his personal use; (2) insubordination; (3) propensity to lie; (4) disloyalty; (5) vindictiveness; and (6) deviousness. However, the issue of the cellular telephone was fully resolved by 2002. Plaintiff received a written reprimand, and he wrote an apology. Both Randall and Shurling testified to that effect. Moreover, a reasonable jury could conclude that the other stated reasons – his insubordination, propensity to lie, disloyalty, vindictiveness, and deviousness – all relate to his reporting of the

"love offerings" to the police. Indeed, Plaintiff testified Judge Randall told him his "head was going to roll" for reporting the "love offerings." (Pl. Depo., p. 90). In addition, a reasonable jury could conclude that the letter Judge Randall wrote to the JQC inquiring about the propriety of Plaintiff's actions, was in fact a letter inquiring whether he could relieve Plaintiff of his duties. This letter was written only six days after Plaintiff's formal report of the alleged misconduct to the police. From all of these factors, a reasonable jury could conclude that the Plaintiff's protected speech as a substantial factor in his failure to be reappointed.

<u>Whether Plaintiff would have been reappointed regardless of his protected speech</u>

Because the Court has found Plaintiff engaged in constitutionally-protected speech and that a reasonable jury could conclude that protected speech was a substantial factor in adverse employment action, the burden then shifts to Defendant Randall to prove Plaintiff would not have been reappointed regardless of this activity. For the same reasons stated above, the Court finds there exists genuine issues of material fact on this prong.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 18] is hereby **GRANTED in part** and **DENIED in part**. The Court grants summary judgment in favor of Defendants on all claims except Plaintiff's First Amendment retaliation claim against Judge Randall in his individual capacity, which the Court finds may proceed.

**SO ORDERED** this 30th day of September, 2010.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

SSH